Council, we're glad to have you with us for your argument in number 2382-21-1061, Cannon v. Peck. Mr. Blanchard. Good morning, your honors, and may it please the court. My name is Norwood Blanchard, and I am here representing the village of Ballhead Island, Calvin Peck and Caroline Mitchell. Mr. Peck and Dr. Mitchell are appellants in this matter, and the village is a, I suppose you'd call them a cross-belly. What? The village is a cross-belly? Yes, a cross-belly. A pelly, I said a cross-belly. Go ahead. I apologize, your honor. I'm using my son's gaming headset here today. So, um, the, uh, your honor, this case, uh, is-  Blanchard, let me ask you at the beginning, I'm not, I was a little confused in the briefing, but has the village conceded the liability and damages to Mr. Terrell and Mr. Coons? The village, your honor, uh, has already satisfied the judgment that was entered against it, or I'm sorry, nothing was, the village was found not liable on any of the claims at trial. So there's, there's nothing for them to concede. Well, Mr.  Payee here, are they conceding the issues of liability and damages as far as Terrell and Coons are concerned? That would seem to be a fairly important threshold question. With respect to Coons and Terrell, the only issue we're raising is the liable per se claims on the termination letters. And the, um, there were two separate claims here for defamation. One of them was the termination letters and the other one was the form F-5s. And what the trial court found was that Peck was responsible for the termination letters, but not the F-5s, and that Mitchell was responsible for the F-5 forms, but not the termination letters. So, um, Mr. Peck is... So you're, you're contesting, you're contesting Mr. Peck's liability to Terrell and Coons as well as the other plaintiffs? To Coons, yes. With respect to the termination letters, yes, Your Honor. Okay. And that, that, that is in our opening brief at pages 26 to 33. And I apologize, too. The first issue we have raised was with respect to Plaintiff Conner. The trial court ruled that Plaintiff Conner's liable claim was a liable per quad claim, and the issue that we raised on that, we raised this by way of a motion for partial findings at trial, at the close of the evidence, again at trial, in our proposed findings, and now for you. But the problem that we had with Mr. Conner's liable per quad claim is that under North Carolina law, liable per quad requires the claimant to show that he has incurred special damages prior to the filing of the lawsuit. As we pointed out in our briefs, North Carolina law determines what evidence must be offered to establish liability for a state law claim. Under these circumstances, and under the facts that were found by the, by the trial court, Conner simply failed to offer any evidence of special damages that he had incurred prior to the filing of the lawsuit. Again, we pointed that out. The plaintiffs conceded that Talent v. Blake, the case, the primary case that we conceded that that is, in fact, the law, and North Carolina does require that. Under these facts, Mr. Conner simply hasn't shown that. Now, the effect of that, Your Honor, would be that Mr. Conner, if he has not shown any special damages, then he can't receive the $1 in special damages and can't receive the other presumed damages that were awarded, nor can he receive punitive damages for that claim without the underlying liability. So, we are not, with respect to him, we are contending that he did not establish liability and that that claim, the court should simply reverse on that. Moving on. That's, that's on the termination letter as to Cannon, but not the full. Conner, Conner. Yes, that's on the termination letter. Yes, Your Honor. Yes. Now, with respect. Why is the essential issue that they are not actual malice? I mean, the question of actual malice in terms of the proof of it. That we also raised the actual malice issue, Your Honor, and I'm glad that you moved to that. The reason that I pressed the issue on the special damages first, with respect to Conner, is because there's no dispute about it. You know, when I'm trying to move for judgment as a matter of law, I have to show that there's no factual dispute. Now, that one is the easiest. Because you brought up the special damages. It seems to me you don't get there if you don't have actual malice. And agreed. But even if you do, then your argument would be special damages would not be proved. So I was right to know why you did not start with dealing with the question of whether the proof of actual malice, which would invalidate the defamation claim here, would be a problem. And I put that argument later, Your Honor. Yes, I am making both arguments. But I thought the special damages one was the clearest cut argument we had. As you pointed out, actual malice is an important issue in this case. And it's reviewed de novo under the Boe's case. For Mr. Peck. It's the issue in all of these, in all of the termination letters. It's the issue with regard to the letters of Cannon, Terrell, and Coons, that letter. And the issue with regard to Conner's letter, too. Yes, Your Honor. And with regard to Mr. Peck and the actual malice test, the argument that we're making with that was that based on the facts, based on the facts that the trial court found, the trial court found that Mr. Peck believed or had been told that there was a complaint. The trial court also found as a fact that Mr. Peck was subjectively, subjectively, he found those text messages offensive. Now, with respect to actual malice, it's one of those situations where the claimant has to show not that the defendant acted unreasonably, but that subjectively the defendant knew or strongly suspected that what his utterance was, what he says was false. And with respect to Mr. Peck, if he believed that there had in fact been a complaint, which is what the district court found, and he himself found the text message exchange offensive, and we pointed out that the district court also found that at least one other member of management, Anderson, found it offensive. In light of those facts, those underlying facts, the legal issue of whether actual malice could be shown with respect to Mr. Peck, we believe that it certainly could not. Not by clear and convincing evidence. Clear and convincing proof here would require basically all of the evidence to point in one direction and there not to be any evidence in the other. And in this case, that threshold was not met. So does it make a difference in the determination of actual malice whether  or not? The difference between, and no, not on actual malice on that, the difference between libel per se and libel per quad, the reason we're focusing on that is libel per quad has this special requirement that you have to show special damages and that you incurred the special damages before you file the law suit. So it's kind of an extra step for the libel per quad. You don't get anywhere on libel per quad just by showing damage to your reputation. You have to show a monetary loss. And a monetary loss, importantly, that occurred prior to the time you filed the lawsuit. And that's what Mr. Connor failed to show here. And again, we clearly raised the issue three times prior to us coming to the subcommittee. With respect to Mr. Peck, though, in the termination letters, we had argued that they should have been classified as libel per quad instead of libel per se because you actually had to look at, and that same thing is true with the F-5 forms, you have to look at the underlying village policies and the definitions contained in them to determine whether or not the statements are libelous. And under North Carolina law, to be libel per se. Are you talking about both the termination letters and the forms now? With respect to the termination letters for Cannon, Coons, and Terrell, and all of the F-5 forms, that's what we're saying. Yes, Judge Edgerton, that's correct. Well, the forms all contain a statement by Mitchell, not by Peck, that there was a complaint filed and I'm not finding any evidence in the record that shows that that's true and that would appear to be false on its face. And my understanding of the district court's opinion was that it looked to the policies not for the general proposition of examining the statement on its face, but whether or not there was falsity to the statement. And concluded that when you looked at the village policies, that the statement had to be false because the facts, as alleged, did not fit it. Looking at the village policies, Your Honor, is what takes it out of libel per se and puts it in libel for fraud. That's the point we're making. And I, Your Honor, I would concede the point that you're making, that he found that Carolyn Mitchell's statements were indeed false. But the question of whether it's false and the legal, which is a factual question, whether the person knew it was false or not, and the legal question of whether it was libel per se or libel per fraud are different things. We're saying that it falls on the libel per fraud side of the fence because you have to look at those village policies to determine what conduct they're accused of engaging in. Is this why you didn't appeal the holding that Mitchell acted with actual malice in  Yes, Your Honor. It was misclassified, but if the judge found that she knew that that was false, then we didn't have a basis for appealing whether or not actual malice was present. We're just saying it was misclassified as, with respect to Mitchell, now, that it was misclassified. But you did appeal the holding that Peck acted with actual malice. Yes, Your Honor, we did. Because, factually, based on the facts that the court found, the trial court found, sitting as a finder of fact, Peck was told that there was a, and I apologize, Your Honor, I'm out of time right here. Can I ask a question? Peck was told, and there's no dispute about this, Peck was told that a complaint had been made and there is absolutely no evidence that he disbelieved that statement. So, the factual finding that we're left with is that Peck's thought bubble over his head was a complaint's been made. A complaint's been made, I found this statement offensive, and I know that other members of management found it offensive. So, with those facts, our contention is that you could not have found actual malice on Peck. Okay. I think you reserved some time for rebuttal. Everybody seems to be taking rebuttal. Okay. Mr. Potter? Good morning, Your Honors. My name is Samuel Potter. I represent all of the plaintiffs slash appellees in this matter. And I want to start where Mr. Blanchard just left off in your question, Judge Otts. If Mr. Peck's letter, which is the subject matter of this lawsuit, said, I'm firing you because I read some text messages that I found offensive and other people did also, then we wouldn't be here today. That is not what the alleged defamatory statements are that form the basis of liability after almost eight years of litigation. Judge Wynn and Judge Agee should be familiar with this case because they ruled on it back in 2018 after summary judgment. What Mr. Peck's letters say is that our clients harass people, that they sexually harass people. And in each and every one of those letters, it stated that the egregious nature of these communications and the flagrant violation of policy thus constitutes detrimental personal conduct and is there by grounds for immediate termination. Those are the defamatory statements made by Mr. Peck. And Judge Howard found at the end of the trial that those were not the reasons our clients were dismissed from their jobs. They were in fact dismissed because Mr. Peck determined that our clients were jerks. So this whole argument over what Calvin Peck believed or didn't believe about a statement being made, a complaint being made, whether anybody found these text messages offensive or not, is not what we're hearing. Well, let me ask you, under our standard of review, the district courts made this factual determination that based on Mr. Peck's own testimony, fired these folks because they were jerks as opposed to what was in the termination letters. What deference do we give that under our standard of review? So I believe the case law cited by Mr. Blanchard is correct in that on this issue, it's reviewed de novo. So it's on the Fourth Circuit, it's on your honors looking at the record in the case to review the evidence in the case to decide whether or not we met our burden at trial or not. Well, so does that mean, to follow up on Judge Agee's question, that if we conclude that calling someone a jerk is just another way of saying these other things, there wouldn't be recovery? There absolutely would be recovery because- Well, not if, because we are making a separate determination. According to you, we're looking at it de novo. You still have to look at the statements that are in the letter. I mean, you have to look at- We look at the statements in the letter and we look at they're fired because they're jerks. I don't know that those two things are inconsistent. I would submit that sexual harassment and calling somebody a jerk are seriously divergent statements. Well, I think jerk could include sexual harassment. Right. So- Sexual harassment could clearly include jerk. Well, I think that's being too kind to sexual harassers to only call them jerks, but- It could include jerk, not that it was- All right, go ahead. So, moving on, the other thing that I don't want to lose sight of here for the court is that the appellants spend a great deal of time, as they have in the pretrial motions, as they did at trial, drawing out offensive text messages that were exchanged in a 16 to 18 page text message exchange. Crude jokes about anatomy and innuendo about Director Mitchell being a lesbian. What the appellants leave out and what they left out at every stage of this case is that of those text messages that are referenced in the brief that was submitted to you were sent by our clients. There were undoubtedly offensive text messages that were contained within those communications, but they're not text messages that came from our client- clients. In particular, Mr. Cannon, Tom Cannon, sent one text message and wasn't even on the text window, number one. And number two, these text messages, all of them, it's undisputed at trial, were sent while our clients were off duty on their personal cell phones. And there was no evidence at trial from any testifying witness that this created any kind of hostile work environment that any of our clients had anything other than glowing reviews as officers throughout their tenure. And so, that all becomes relevant when you look at what were the subjective motivations of Calvin Peck in this case. Mr. Blanchard has spent a great deal of time talking about how Mr. Peck believed that a complaint had been made. Mr. Peck found the text messages that our clients didn't send offensive. He couldn't identify any offensive text messages that our clients did send at trial or in his deposition that was admitted into evidence. And yet, he still signed this letter that accused our clients of these things. And after trial, the court found that he just simply was not credible because not only did he testify his real reason was that they were jerks, but also that there was no evidence to that harassment or sexual harassment or discourteous treatment or any of the things that are in the letter were true or that he believed them to be true at the time that he made them. So, you know, those things are all evidence. Who prepared the termination letters? There was differing testimony on that, Your Honor. The director of HR at the time, Dr. Ellison, testified that she and Mr. Peck prepared the letters together. Mr. Peck contends that Dr. Ellison prepared the letters, but Mr. Peck never denied that he signed the letters and understood that he was making that communication himself. I thought there was testimony from somebody who I thought was the HR director that Mr. Peck delegated to the HR director the preparation, essentially, that the HR director was to look through the village's policy manual and find the basis for firing the plaintiffs. Am I remembering incorrectly? I believe you're remembering incorrectly, Your Honor. I believe that he pointed out the things that he wanted to include in the letter, and she prepared the letter was her testimony. So, turning to this issue of special damages as it relates to the Perquad claim with Mr. Connor, the appellant focuses and tries to frame our claim of special damages as the damage caused by being fired from the job. The argument, as I understand it, is because the publication of the defamatory statements were made after the termination, that our damage occurred prior to the defamation and cannot be the basis of a lawsuit arising out of that post-publication. But that is a mischaracterization of what our claim was in this case. We spent a great deal of time with all four of our clients on the stand, but Mr. Connor in particular, noting that his diminished earning capacity was caused by the publication, that he continues six, seven years after he was terminated, and certainly during the year after he was terminated and before this lawsuit was filed, to have diminished earning capacity. And he testified to that clearly, and Judge Howard found it credible. Now, the other evidence that supports the continued diminished earning capacity are our other three clients. Mr. Coons applied for dozens of jobs and only eventually got a job because he had a personal connection to the chief in the village or in the town of Shallote in Brunswick County, North Carolina. Mr. Cannon applied for dozens of jobs and was unable to get one at all other than working at a tree farmer, working as a tree farmer in western North Carolina. And Mr. Carroll, after trying to find a job, eventually gave up and started doing something else for a living. So the special damages, the pecuniary loss that Mr. Connor suffered was his diminished earning capacity and lost income that occurred after publication of the defamatory statements and prior to the lawsuit. Now, that special damage has continued after the lawsuit was filed, but that's an important distinction here that we're not just talking about the fact that he lost his job at Bald Head Island. It's the continued effects of the defamatory statement on his ability to get employment elsewhere. What is the evidence in the record that his inability to find other work or his PTSD disorder, post-traumatic stress disorder, were the result of libel? So taking the last of those, the PTSD was what he testified to a trial that he had been diagnosed with. And for purposes of this... No, no, no, no, no, no. I'm sorry. I hope I haven't been clear on my questions. I understand that he testified to that. How do we... What evidence is there that libel caused that? His testimony. That's all. But Your Honor, I would concede that PTSD is not the basis of special damages. That's not... We can move on from that for purposes of this. The inability to find law enforcement employment. How is that the result of libel? Because, number one, if he applies for a law enforcement job, this F5P would be disclosed to them stating that he was fired for creating a hostile work environment after a complaint was filed regarding his conduct. And he showed evidence that that could happen? He testified to that, Your Honor. Now, but moving on from that, Mr. Connor... Well, wait a minute. Did he testify or present other evidence that he actually applied for a law enforcement job? He did not, Your Honor. And that was the point I was trying to make earlier, was that each of our four clients testified that the statements, both in their F5P and the publication of the reasons for their firing, which were false, made it nearly impossible for them to get law enforcement or emergency medical position or firefighter positions. Some of our clients came from a law enforcement background. Some of them came from firefighting and emergency medicine background. Mr. Connor was from the firefighting and emergency services background. And so he was more likely to go that path. The evidence that came out at trial was that the only jobs that any of these four gentlemen were able to obtain after they were dismissed were jobs that came out of close personal connections with the specific people who were managing those organizations. So none of our clients got jobs. But I think that's not directly responsive to Judge Agy's question. What he asked you was, did they apply to him for any other jobs? Mr. Connor did not apply for any other jobs. The reason Mr. Connor did not apply for any other jobs was because he knew, and there was testimony at trial to this, both for Mr. Connor, from our other clients, and from our other witnesses, that this type of statement, this type of thing in your record as a firefighter, as an emergency medical professional, or as a police officer, disqualified you from any employment. And Mr. Connor knew that. All of our clients knew that. And what's happened to them in the almost eight years since they were fired demonstrates the difficulty. I mean, Mr. Connor is still getting paid significantly less than he was at the Village of Bald Head. And I would submit to the court that he's not doing that because he thinks he's going to recover money from the Village of Bald Head. He's doing it because he knows that he can't get a job anywhere else. Mr. Coons, for instance, was able to get a job after a year of looking. Mr. Connor, I'm sorry, Mr. Cannon was never able to get a job, ever. And these guys know each other. They know what the other is going through. So, and take our client's credibility out of it completely. There was testimony at trial from third parties, not plaintiffs or defendants, as to the unemployability of somebody in these fields who had this in their record. In other words, had a dismissal for inappropriate electronic communications, harassment, sexual harassment, etc. Is there evidence in the record that you can get a job if you don't apply for it? There's not evidence in the record to that effect, Your Honor. I'm out of time. Thank you. You have some time left for rebuttal, too, I think, don't you? I do. Yes. Okay. Thank you. Mr. Blanchard? Your Honor. Thank you, Honor. I apologize. Judge Agee, you asked a question about who prepared the termination letters. Your recollection of the record was correct on that. It's page 1339 in the Joint Appendix. It's at paragraph 90. The trial court found as a fact that after discussing the matter with Defendant Mitchell, Defendant Peck directed Dr. Williams to prepare termination letters. So, you're exactly right. That was the fact. And that was based on what Karen Williams, Dr. Williams testified at trial. Well, does that help you, though? Because it seems like to me that that would sort of undergird a finding of actual malice if Mr. Peck had determined, as the district court found, that he was going to fire these plaintiffs because they were jerks, and then he delegates to a subordinate, well, go find me reasons from the village policy manual that will substantiate it. Seems like to me that that's not a helpful fact for you. Well, to go back to Judge Motz's line of questioning about the finding that it was because they were jerks, Your Honor, I think in this case, and this is what Mr. Peck testified at trial, that was a shorthand way of saying, hey, they were jerks and they did these bad things. I think based on the evidence we had at trial, it was very clear that he was the village manager. He didn't know exactly, with a lawyer's clarity, exactly what each one of these policy provisions meant. But we do have the factual finding, and it's at Joint Appendix 1330A, paragraph 83, that Peck believed that the comments were directed at Mitchell because of her sexual orientation, which he found offensive. So the trial court specifically found the fact that Mitchell, that Mr. Peck believed that they were mocking Mitchell for being a lesbian, and he found that offensive. Now, laymen out there, lawyers may know different, but now, under Supreme Court precedent, the law of our land, sexual orientation is in fact covered by Title VII. Making fun of somebody, mocking them because they're gay, is indeed sexual harassment. So I think that the fact that he delegated, you know, look through the policy, Dr. Williams, and, you know, this is what I think happened, look through the policy and write up a letter for me, I don't think it hurts him. Now, again, as Mr. Potter pointed out, we do concede he signed these letters. What we don't concede is that he believed that the statements in them, that they were, you know, engaging in these comments, was false. The problem for, with the actual malice following up on Judge Gage's line of questioning, is that it appears that Peck decided to fire these plaintiffs before he knew what the policy provisions were. That seems to lean toward actual malice. Well, Your Honor, he decided to fire them based, according to the facts found by the trial court, based on what Carolyn Mitchell told him. And the actual belief that he had in his head, according to what the trial court found, was that they were mocking Mitchell because, in part, because of her sexual orientation. So we have to look at subjectively what he believed. And by the way, you raised a good point about actual malice. Remember that in a defamation case, when the plaintiff's a public official, we all agree they are, under New York Times, only provably true or false assertions of fact are actionable. Only true or false, verifiably true or false assertions of fact are actionable. And this is one of the issues we've raised. Mr. Peck's subjective motivation for firing them wouldn't meet that test. And I'll give you a hypothetical. Let's hypothesize that he did, in fact, believe that they had violated the sexual harassment policy, but said, well, I'm going to fire you because you're jerks. Same situation. He's lied about his true—not because you're jerks. I'm going to fire you because you're tutorial fans. Again, you've proved that he's lied about his subjective motivation. But is it defamatory? No. The underlying policy violations are what you have to look at in a situation like this. And back to your question, Judge Mott, about the jobs. If you publicly label someone as being—and I think this maybe only applied to having perpetrated sexual harassment, are you saying that that's a statement of opinion? I'm saying that some of the things like discourteous treatment and those other allegations are clearly statements of opinion. But on the sexual harassment one, I think if you looked at the policy, I think it could be a statement of fact. But based on what he believed happened, they would have fit that. You know, he believed they were— Right, right. But for defamation per se purposes, it would go to whether or not that harmed the plaintiffs in their trade or whether or not, and I don't think the district court got this, it held them up to ridicule within larger society. I mean, those are the elements for, I think, for defamation per se. There are different ways you're correcting— If the trial court found that, no, Mr. Peck didn't really think they were guilty of sexual harassment, but he just included that in the letter after the fact to make it look good, it seems like that goes a long way toward sustaining the district court's finding on actual amounts. If the trial court had found that he did not believe there had been a complaint and he did not believe that any of this language was offensive, I believe that I would concede that that statement's correct, Your Honor. But under the circumstances, what the trial court did find, he believed, won't support actual malice. And I'm out of time. I apologize. We have any further questions? Thank you very much. Thank you, Your Honor. Mr. Potter? I mentioned this before. None of our clients were involved or stated any jokes or made any innuendo regarding Dr. That was not stated by any of our clients at all. We have our sort of appeal issues as well, because we do have a cross-appeal in this matter. The first one is related to a pretrial motion in Lemony and its subsequent effect on the defense of sovereign immunity asserted by the village of an insurance policy by the Interlocal Risk Insurance Policy Pool. I may have gotten that wrong, but it's an insurance policy that the village had that would have provided a defense and indemnification on the claims asserted by our clients against the village. Prior to trial... Is that insurance policy in the record? Is it in the record from the trial, Your Honor? Yes, it was. As I understand this particular issue, you brought a claim against the village as an entity, and it pled sovereign immunity. So then the burden would have shifted back to you to show under North Carolina law that that was inaccurate because there would have been liability to the extent of the insurance policy. So was the insurance policy placed into evidence to carry your burden? Not at the trial, Your Honor. It was not. But what I'm getting ready to explain... Well, where else can you place it into evidence? Well, there was a motion in Lemony preventing it from coming into evidence that the plaintiff, that the defendants filed in this action. And when Magistrate Swank, who heard the pre-trial motions, had the hearing on this, my law partner, Mr. Cox and Mr. Blanchard agreed that admitting the insurance policy into evidence was inappropriate under established law. And so both sides agreed that it would not be admitted into evidence. The defendants did not raise the defense at trial. And had they, then the burden would have shifted back to us and we would have introduced it. But this was a situation where a motion in Lemony was filed. It would have been granted. But we agreed with defense counsel that it would not be admitted because it was not properly admitted at trial unless the defendants raised the defense at trial, which they did not do. And so... What's your problem now? You've already waived that claim, that argument. I'm sorry, Your Honor. I don't understand the question. You agreed that the insurance policy would not be an issue at trial unless they raised this as a defense, right? Correct. But the problem is the court ruled that we didn't have a claim against the village because they had raised the defense and it was our burden to introduce the insurance policy at trial. So I think... You could have said to the district court, okay, we agree that this isn't a jury issue, but we are making a motion for summary judgment or motion on the pleadings or something with respect to this particular issue. But instead, you just agreed the insurance was not a matter for the jury's consideration and never said anything further that it was... I guess your argument is that it's for the judge to decide this. Well, our argument is that the defense is the defendant's defense to raise and that had they raised it at trial, which they did not do, we would have then had a different scenario than what the motion in limine considered. And they didn't. And so therefore, we didn't introduce the insurance policy, but they didn't raise the defense either. And it seems like where the court agrees and the parties agree that it's not going to be introduced because it's not proper to be introduced at trial, that you can't then have a gotcha moment after the trial is over and say, even though the parties agreed and the court agreed, you didn't admit the insurance policy at trial. It's sort of inverting. I mean, you didn't bring it up in the jury because you can't put the policy for the jury. So then it's converted to a bench trial. The problem you didn't say they didn't bring up sovereign immunity, where sovereign immunity exists for all entities. And in order for you to overcome that, you've got to introduce something to say they waived it. And you didn't. Your Honor, I'm sorry. I mean, I understand that. I mean, you get to you go to trial and you sue an entity that has sovereign immunity. And your position is we don't have to show that it's got insurance. If they don't mention sovereign immunity. At a bench trial, Your Honor, it's still an affirmative. Even with the jury there, ultimately, when it comes back, maybe on damages or somewhere, you've got to show the sovereign immunity has been waived. And if it's not been waived, it exists. And you didn't. Your Honor, it can be waived by failing to raise. And they didn't raise it at trial either. I'm talking about you. You mean failure to bring up the sovereign immunity would waive the sovereign immunity defense? Sovereign immunity is an affirmative defense, is my point. It's an affirmative defense. It doesn't exist without being raised. The state can waive sovereign immunity other than through the purchase of insurance by not raising the defense, is my point. All right. I think you have exceeded your rebuttal time. Unless my colleagues have further questions, I think we're done. Thank you very much for your argument.
judges: Diana Gribbon Motz, G. Steven Agee, James Andrew Wynn